## Youngman *et al. versus* The Elmira and Williamsport Railroad Co.

1. A railroad company executed a mortgage of all its real property, franchises, &c., under a decree of the Supreme Court the mortgaged property was sold and conveyed by the trustees in the mortgage to Whelen. This was effectual to Whelen at least as an assignment of the mortgage.

2. From that time Whelen and his assignees stood in the shoes of the mortgagee.

3. A mortgagee may maintain ejectment for the mortgaged property before condition broken unless there be a stipulation to the contrary.

4. A railroad with its appertenances necessary to the exercise of its franchises cannot be levied on and sold under a judgment against the corporation.

5. A company were authorized to hold so much land not above five acres in any one place and improvements necessary for water stations, &c. They purchased land which was not used for the road, and mortgaged all their property and franchises, with the right to maintain possession "according to the effect and meaning" of the acts of incorporation. The land purchased was not included in the mortgage.

6. If a mortgagee proceed by scire facias in a court having no jurisdiction, a purchaser having paid his money under such proceedings, would be entitled to be subrogated to the mortgage.

7. If a mortgage create a trust and provide that a power of sale is to be executed by the trustee on certain contingencies, he may be controlled, &c., by a court of equity at the suit of a cestui que trust, and when that court decides that the contingency has arisen to give it jurisdiction, its decision cannot be impeached collaterally.

8. Those becoming encumbrancers *pendente lite*, on a mortgage, are not necessary parties to a bill to foreclose.

9. Such persons are bound by the decree, for they can claim nothing but what belonged to the person under whom they assert title.

10. A corporation purchased land *ultra vires*, mortgaged all its property, franchises, &c., in trust to secure bonds; a judgment was afterwards recovered; all the property, &c., of the corporation was afterwards sold by the trustee under a decree in equity and afterwards the land was sold under the judgment; the purchaser under the judgment took no title.

11. The legislature after the decree of sale in equity, passed a law to carry the decree into effect. *Held*, that this cured any defect in the jurisdiction of the court.

12. No one could object to the decree and sale but the mortgagors and the bondholders.

13. Bradley *v.* Chester Valley Railroad, 12 Casey 141, remarked on.

April 2d 1870. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Error to the Court of Common Pleas of *Lycoming county:* of January Term 1870, No. 323.

This was an action of ejectment brought March 23d 1866, by The Elmira and Williamsport Railroad Company against Allen Kay and George W. Youngman, for about half an acre of land, part of a tract of 14 acres, in the city of Williamsport.

The Williamsport and Elmira Railroad Company was incorporated by the Act of June 9th 1832, and by the 6th section of

a supplement of March 20th 1838 were "authorized to hold such an amount of land, not exceeding five acres in any one place, and improvements at the termination and along the line of the road, as may be necessary for water stations and accommodation of passengers, and for depositing and shipping commodities conveyed or designed to be conveyed on the railroad, and necessary and convenient land and buildings for workmen, shops and other purposes connected with the general objects of the said company."

On the 18th of May 1853, The Williamsport and Elmira Railroad Company, under authority of law, for the purpose of securing certain bonds, executed to Charles W. Rockwell, trustee, a mortgage of the whole of said railroad, constructed or to be constructed, together with the railways, rails, bridges, fences, privileges, rights and all real property of every description belonging to said company, and which shall hereafter be acquired and owned by them, and all the tolls, incomes, issues and profits (whenever said parties of the first part shall be in default) to be derived and to arise from the same, and all the lands used and occupied for railways, depots or stations, with all buildings standing thereon, or which shall hereafter be procured therefor, together with all the franchises and corporate privileges to the said company belonging, including all the tolls," &c.  *  *  *  "Subject to the possession, control and management of the directors of said company, as long as said company shall well and truly perform all and singular the stipulations of the bonds aforesaid," &c.  The mortgage further provided, that if the company should be in default for sixty days in payment of the interest, the trustee might take possession of the mortgaged property or might at the request of the holders of at least one-half the bonds, cause the same to be sold.   On the 31st of May 1854, the same company, for the purpose of securing other bonds, executed to Charles S. Boker, trustee, a second mortgage (subject to the mortgage of 1853) of the same property and with the same stipulations in case of default, as to taking possession and sale.   Boker having died, William D. Lewis was substituted as trustee in his place.

On the 2d of August 1856, William W. Willard conveyed the 14 acres above mentioned to the same company.

On the 31st of March 1857, the same company for the purpose of securing other bonds to the amount of $500,000, executed to William C. Longstreth and John W. Mayward in trust, another mortgage of "the whole of the railroad, of them the said party of the first part, constructed and to be constructed, and the corporate privileges and franchises thereunto belonging, and all and singular the railways, rails, bridges, masonry and other superstructures, wharves and depots, stations, buildings and improvements whatsoever, and real estate, and all the tolls, income, issues and profits to accrue from the same or any part thereof belonging to the said

company, save only so much as may be necessary for expenses and repairs, as is hereinafter expressed, and also all the rents, reservations and payments which now are or hereafter may be reserved and made payable to them upon the sale, lease or conveyance of any part of the estate, rights or privileges hereinbefore described, and generally all the lands, tenements, and hereditaments and real estate of said party of the first part whatsoever and wheresoever, and also all the ways, streets, alleys, passages, waters, watercourses, easements, franchises, rights, liberties, privileges and appertenances whatsoever, unto the hereby granted premises belonging, &c., * * * subject, nevertheless, until default shall have occurred as hereinafter mentioned, to permit and suffer the said party of the first part hereto, and their successors and assigns, and their president, managers, officers and agents, to retain the free, absolute and uncontrolled use, possession and management of the estate hereby granted and hereinbefore mentioned, described, and intended to be now or hereafter conveyed and mortgaged, and to use, occupy, manage and control the same, as though this indenture had not been made, according to the effect and meaning of the several acts and supplements of any acts of the legislature incorporating or concerning the said party of the first part."

"And whenever, according to the provisions hereof, it shall become the duty of the trustees to enter upon and take possession of the premises herein described and conveyed, then immediately either to issue process upon this indenture of mortgage, and sell the property hereby mortgaged and conveyed, by due course of law, or to enter upon and take possession thereof, or with or without entering upon and taking possession, to sell and dispose of the same in whole or in part, in such way by public auction, after having given at least three months' public notice, &c., for any price or prices, on any terms, with any conditions, &c., as in the sole and absolute discretion of the trustees shall appear best for the interest of the holders of the said bonds, &c., and to make, execute and deliver unto the purchaser or purchasers thereof, good and sufficient indentures or conveyances, vesting in them a full and absolute title in fee simple, or for any other less estate in the premises thereby conveyed freed and discharged from all trusts whatever, &c., and without any obligation on the said purchaser or purchasers, to see to or to be responsible for the application of the purchase-money, or for the propriety or expediency of the exercise of any power herein contained; in relation to which the execution of indentures or conveyances by the trustees or trustee for the time being, shall be taken and considered in all cases, and before all tribunals, to be conclusive upon the parties hereto, as well as upon the holders of the bonds issued as aforesaid," &c. * * * With the further stipulations that "the company would on the demand of the trustees convey to them, &c., all real estate

which the said company shall hereafter in any way acquire or become seised of, or which may be held by third persons for their use, and subject to their conveyance or control, and shall and will also execute all and every such further deeds, conveyances and assurances in the law for the better assuring," &c., the premises * * * " for the better effectuating and carrying out the provisions, objects and purposes of this mortgage, and securing the payment of the principal and interest of the bonds, to be issued as aforesaid;" * * * to be held by the trustees on the same trusts, &c.; that the company would keep the property in repair and punctually pay the interest on the bonds.

That upon default in payment of interest or principal for thirty days, the trustees, on the request of persons representing at least $50,000 of the bonds, may issue a scire facias immediately, obtain judgment, and sell the property, or in their discretion dispose of the property as before provided. None of the mortgages mentioned the 14 acre tract specifically. On the same day (March 31st 1857), the company executed to Longstreth and Maynard as trustees a mortgage of all their locomotive engines, cars and other movable stock described in a schedule attached to the mortgage, to secure $500,000 of bonds mentioned in the mortgage. This mortgage was called the "chattel mortgage."

On the 17th of September 1859, Clarence H. Clark, a holder of bonds of the Williamsport and Elmira Railroad Company, secured by all the above-mentioned mortgages, as well for himself as others holding similar bonds, filed a bill in the Supreme Court against the Williamsport and Elmira Railroad Company, Charles M. Rockwell, trustee, William D. Lewis, trustee, William D. Longstreth and John W. Maynard, trustees, and Thomas Kimber and William D. Lewis.

The bill set out amongst other things, the ownership by the company of property both in Pennsylvania and New York, the execution of the several mortgages above mentioned, that all the bonds secured by them were outstanding, and that a large amount of interest was due on the bonds; that the company was heavily indebted for materials, labor and for floating liabilities to the amount of $350,000, which were secured by negotiable paper guaranteed by the president and directors of the company; that Kimber and Lewis and other directors had individually and without consideration become liable for large sums of money procured for the company and lent to the company; that Kimber and Lewis, &c., claimed that in equity they should be refunded from the earnings of the company; that the holders of the floating debt and coupons had brought suit on their claims, and that the property of the company would be sold under judgments on these claims, and the security of the bondholders would be lessened; that the rights of the parties had not been settled, and will re-

quire for their adjustment the equitable interference of the court; that the circumstances will involve separate and independent litigation to the injury of the trust property; that the company is insolvent, and the property is in such condition that the rights of the parties should be defined before a sale of it; that the property in both states should be sold entire; and that there was danger that the persons employed on the road would leave the road and prevent its use, &c.

The prayers were that the rights of all the parties might be defined and declared; that the mortgaged premises might be sold as the court should direct; that a receiver be appointed. After filing the bill, Townsend Whelen was appointed trustee in the place of Judge Maynard. Rockwell and Whelen, trustees, filed an answer, declaring their belief that it would be for the benefit of all in interest that the property in Pennsylvania and New York should be sold entire, and prayed that no decree might be made which would prevent them from making sale of the mortgaged premises, but that the court would make an order authorizing a sale by them. Answers were filed by the other defendants.

On the 29th of February 1860 the Supreme Court decreed that by reason of default in the company, the bonds secured by 1st and 2d mortgages had become due; that those mortgages were respectively the first and second liens on all the railroad constructed at their date, and which had afterwards been constructed on all railways, &c., privileges, &c., and all real property then belonging to the company or afterwards acquired; and declared the amount due on each of the mortgages. It was further decreed that the third mortgage was the third lien on the premises before described, and that all the property mentioned in the second and third mortgages is included in that mortgage, and that the property described in the chattel-mortgage is not included in either of the other three mortgages. The court further decreed that the trustees of the three mortgages sell at public sale, at the Philadelphia Exchange, on          day of          1860, all the property and franchises mentioned in those mortgages, and all the said property should be put up and sold as one property, &c.

The court further decreed that the proceeds of sale should be applied, first, to the payment of the bonds, &c., secured by the first mortgage; then, if there were any excess, to the payment of the bonds, &c., secured by the second mortgage, and any balance remaining to be applied to the bonds, &c., secured by the third mortgage.

In the advertisements the 14-acre tract was described and designated as No. 1.

On the 12th of March 1860, a law was passed reciting the foregoing proceedings, and that " all parties interested in the said company as stockholders and bondholders, or a large majority of them,

have agreed upon an amicable settlement of their differences, and require the authority of law to carry the same into effect;" and enacting that in case the property, franchises, &c., of the company should be exposed to sale under the proceedings, the agent of the holders of more than one-half of the bonds might purchase the whole property, and if the agent should purchase he should, on confirmation of the sale, &c., have all the rights, franchises and apportenances of the company, for the use of the first mortgage bondholders who should by writing authorize him to act for them; that if William D. Lewis and others named, should within thirty days after the delivery of the deed, if that should be after the passage of the act, agree to accept its provisions, they should be a corporation under the name of "The Elmira and Williamsport Railroad Company," and on the formation of the corporation, the said agent should convey to it all the property and franchises purchased by him for the price of $1,000,000, and the corporation should be vested with all the rights, franchises, &c., of The Williamsport and Elmira Railroad Company.

On the 20th of April 1860, the trustees jointly returned that they had, on the 18th of April, sold all the mortgaged property which included specifically the 14 acre tract, to Edward S. Whelen, for $100,000, and prayed that the sale might be confirmed.

The court thereupon made the following order: "April 21st 1860, the within petition was presented and thereupon it is ordered that the sale within reported, be confirmed and a deed is ordered to be made."

On the 11th of May 1860, E. S. Whelen conveyed to the Elmira and Williamsport Railroad Company, the plaintiffs. On the trial, before Gamble, P. J., January 13th 1870, the plaintiffs gave in evidence the foregoing facts and closed.

The defendants gave in evidence a judgment for $1014.03, recovered October 22d 1859, in the District Court of Philadelphia, by John Jones, against The Williamsport and Elmira Railroad Company. Testatum fi. fa. to Lycoming county, entered there, January 11th 1860. Vend. ex. July 25th 1864, returned September 2, "Land sold to George W. Youngman for $510." Sheriff's deed acknowledged December 2d 1864. They then called A. T. Nichols, who testified: that for 14 years, the 14 acres had been used by everybody for any purpose; the Kay lot had no connection with the railroad; which did not run near it; it had not been used by the company; witness rented from the railroad company for the purpose of piling lumber for his planing mill.

The defendants requested the court to charge:—

1. That the land in dispute having been purchased by the Williamsport and Elmira Railroad Company, on the 3d day of August, A. D. 1856, some years after the execution and recording

of the mortgages dated respectively January 1st 1853 and May 31st 1854, it is not affected or encumbered by the said mortgages, or by either, and could not be *legally* sold under any proceeding in law or equity on either of the said mortgages.

2. That George W. Youngman, the purchaser at the sheriff's sale, was not bound to look for liens created by the railroad company further back than the date of the deed from W. W. Willard, to wit, August 2d 1856.

3. That the Supreme Court had no jurisdiction to order the sale of the land purchased of W. W. Willard, there being no allegation in the bill or any.part of the proceedings or the decree that any of the bonds secured by the mortgage, dated 31st March 1857, or any interest in the same, were due and payable, either at the time of filing the bill or making the decree.

4. That on the 29th day of February 1860, the Supreme Court had no jurisdiction to decree a sale of any of the property mortgaged by the mortgage of 31st March 1857, on the bill of a bondholder on account of a default of the payment of any interest that might become due or payable, and that the proceedings provided for in the *mortgage* in case of default in payment of the interest could only then be pursued.

5. That the decree of the Supreme Court directing the sale of the property of the Williamsport and Elmira Railroad Company, was a decree made by *consent* of the parties to the proceedings, and is *not* binding upon the defendants in this action.

6. That on all the evidence in this case, the verdict of the jury should be in favor of the defendants.

Without answering the points specifically, the court directed the jury to render a verdict for the plaintiffs, which was done accordingly.

The defendants took a writ of error and assigned for error the instruction of the court, and not answering their points.

*G. W. Youngman* and *J. W. Comly,* for plaintiffs in error.—The lot was not used or necessary for the railroad, and the company was authorized to hold only 5 acres : Shamokin R. R. *v.* Livermore, 11 Wright 465. The company did not own the land at the date of the mortgages of 1853 and 1854, and therefore could not mortgage it : 4 Kent's Com. 154. A mortgage of after-acquired property can have no validity against third persons having liens on the property : Coe *v.* Columbus & Cin. R. R., 10 Ohio St. R. 391; 1 Hilliard on Mortgages 7. The Supreme Court had no jurisdiction to decree the sale : Bradly *v.* Chester V. R. R., 12 Casey 141. The application should have been to the court that had jurisdiction of the accounts of the trustees : Ashhurst *v.* Montour Iron Co, 11 Casey 30. The mortgage at best was in the nature of one to secure advances and its lien attached

only when the bonds passed to a bonâ fide holder: McClure v. Roman, 2 P. F. Smith 458; Bank's Appeal, 12 Casey 170; Terhoven v. Kerns, 2 Barr 96.

*H. C. Parsons* and *Armstrong & Linn*, for defendants in error.— A purchase of land in excess of its charter can be avoided only by the Commonwealth: Leazure v. Hillegas, 7 S. & R. 313; Goundie v. Northampton Water Company, 7 Barr 233. A railroad company may mortgage after-acquired property: Peirce on Railroad Law 530. The legislative recognition of the decree validated it: Menges v. Dentler, 9 Casey 499. The decree cannot be examined collaterally: Thomas v. Harris, 7 Wright 231.

The opinion of the court was delivered, May 5th 1870, by

SHARSWOOD, J.—Several points have been made and questions discussed in the able and elaborate argument of the learned counsel for the plaintiffs in error, which, in the view we take of the case, it is unnecessary here to consider. The title of the premises, it is agreed, was in Willard prior to August 2d 1856. On that day he conveyed to the Williamsport and Elmira Railroad Company. On the 31st of March 1857, this company executed a mortgage to trustees to secure certain bonds to be issued.

On the 28th April 1860, these trustees united with the trustees under two prior mortgages, in a conveyance to Edward S. Whelen, who by deed dated May 11th 1860, conveyed to the Elmira and Williamsport Railroad Company, the plaintiff below.

The defendant's title was grounded on a judgment recovered by John Jones against the Williamsport and Elmira Railroad Company, in the District Court for the city and county of Philadelphia, a testatum fieri facias issued thereon, and entered on the docket of Lycoming county January 16th 1860.

The lien, therefore, upon which his title vested, and to which it must relate, was subsequent to the date of the mortgage of 1857.

Whether the sale made by the trustees under the mortgage was pursuant to the powers contained in that instrument, so as to bar and extinguish the equity of redemption of the mortgagor, is a question which does not arise on this record. The conveyance to Whelen was at least effectual as an assignment of the mortgage, and he and his assigns from that time stood in the shoes of the original mortgagees: 1 Washburne on Real Property 519. That a mortgagee or his assignee may maintain ejectment and recover possession of the mortgaged property before the condition is broken, unless there is a stipulation in the instrument to the contrary, is too well settled in this state to be any longer a subject of question: Lessee of Simpson v. Ammon, 1 Binn. 175; Smith

*v.* Shuler, 12 S. & R. 240; Knaub *v.* Esseck, 2 Watts 282; Martin *v.* Jackson, 3 Casey 504. The provision made in the mortgage of 1857, on the subject of possession, plainly excludes the premises claimed in this ejectment. The language is, "subject nevertheless until default shall have occurred as hereinafter mentioned to the possession and use of the said party of the first part, their successors and assigns, and their president, managers, officers and agents, on the road of the said company, or on any other road, subject to this mortgage, according to the effect and meaning of the several acts and supplementary acts of the legislature, incorporating or concerning the said party of the first part." Now the contention of the plaintiffs in error must be and has been that the premises in dispute form no part of the road, else their title by the sheriff's sale under the testatum fails altogether. The road with all its appertenances being necessary to the exercise of the franchises granted by the sale, could not be levied on and sold under an execution on a judgment against the corporation: Ammant *v.* The New Alexandria and Pittsburg Turnpike Road, 13 S. & R. 210; The Susquehanna Canal Co. *v.* Bonham, 9 W. & S. 29; Shamokin Valley Railroad Co. *v.* Livermore, 11 Wright 465. The lot in question then being no part of the road is left unaffected by this provision, and the right of the mortgagee to enforce his legal title by an ejectment remains as at common law. The plaintiffs in error having succeeded to the rights of the mortgagors, could doubtless have set up any equity in them to defeat the recovery. They could have shown that no bonds had been issued for the security of which the mortgage had been given, or that if issued they had been fully paid and satisfied; but then the onus was upon them to make this out, otherwise the primâ facie legal title of the assignees of the mortgage must succeed. Nothing of the sort was attempted or pretended.

But it is contended that the mortgage of 1857 was extinguished by the decree of this court in equity, January Term 1860, No. 6, and the sale made under it, though at the same time it is most strenuously maintained that the court had no jurisdiction of that case, and that the decree being *coram non judice* was therefore a nullity. The plaintiffs in error are on the horns of a dilemma. If the court had jurisdiction, then the decree, however erroneous in law or in fact, was conclusive, and a valid title passed in pursuance of the sale made by the trustees under it; if the court had no jurisdiction, then its decree was a nullity, and the rights and titles of the parties remain as though it had never been made. If a mortgagee were to proceed by scire facias in a court having no jurisdiction, the purchaser under such proceedings having in good faith paid his money, would be entitled in equity to be subrogated to the mortgage. It clearly would not be extin-

guished by a void proceeding. We have no question in this case of equitable subrogation; for there is a legal conveyance of the land, which in law is an assignment of the mortgage, duly executed by the mortgagees themselves.

Here the cause might well be rested. This view concedes that the court had no jurisdiction of the bill in equity so as to decree a sale which would extinguish the mortgage of 1857 and the equity of redemption of the mortgagors. It is by no means clear, however, that this is so under the principles of the case of Bradley v. The Chester Valley Railroad Co., 12 Casey 141. It is there admitted, that if the mortgage create a trust and provide that the power of sale is to be executed by the trustee in certain contingencies, he may be controlled, restrained and directed by a court of equity at the suit of a party standing in the relation of a cestui que trust. Now it was for the court to decide whether the contingency had happened which gave them jurisdiction, and that decision could not be impeached collaterally, either by the parties, or those who, not being necessary parties, were bound by the decree. In this category was John Jones, the judgment creditor. He had no encumbrance on the property until after the commencement of the proceedings in this court. It is perfectly well settled, that encumbrancers who become such *pendente lite*, are not necessary parties to a bill to foreclose, although they are bound by the decree, for they can claim nothing except what belonged to the person under whom they assert title, since they have constructive notice; and there would be no end of such suits, if a mortgagor might by new encumbrances, created *pendente lite*, require all such encumbrancers to be made parties: Story's Eq. Pleadings, § 194; 1 Washburne on Real Property 593; Bishop of Winchester v. Paine, 11 Vesey 194, 197; Garth v. Ward, 2 Atk. 174; Adams v. Paynter, 1 Coll. 532. The vendee of the sheriff by deed acknowledged December 2d 1864, long subsequent to the decree, was of course bound by it if the judgment creditor was. But even if this were not so, the Act of Assembly of March 12th 1860, Pamph. L. 682, cures the defect. It would surely have been competent for the legislature to have authorized a sale by the trustees, even if the contingencies had not occurred. Nobody would have had any right to object but mortgagors and the cestuis que trust, the bondholders. They were parties consenting, as the act recites; at least we hear of none who dissented. They raised no voice against the sale. The legislature then ratified the jurisdiction of the court, authorized the attorney of the first mortgage bonds to become the purchaser at the sale, and to convey the title so acquired to the new company incorporated by the act under the name of the Elmira and Williamsport Railroad Company, the plaintiffs below in this eject-

ment. We think, therefore, that the instruction of the learned judge below to the jury to render a verdict for the plaintiffs was right.                                    Judgment affirmed.